IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| MITTENDORF SPORTS, a Maryland Sole Proprietorship,<br><br>Plaintiff,<br><br>vs.<br><br>TOP RANK, INC., a Nevada corporation, and TERENCE CRAWFORD, an individual,<br><br>Defendants. | 8:17-CV-11<br><br>MEMORANDUM AND ORDER |

The defendants in this case are successful boxer Terence "Bud" Crawford and his promoter, Top Rank, Incorporated. The plaintiff is Mittendorf Sports, a sole proprietorship of Chris Mittendorf (collectively, Mittendorf). At issue is a 2011 contract between Mittendorf and Top Rank that allowed Top Rank to become Crawford's promoter: Mittendorf claims that Top Rank breached that contract by not paying Mittendorf a percentage of the purse from Crawford's championship title defenses, as Mittendorf claims the contract requires.

Specifically, Mittendorf claims the contract gives him a piece of the action any time Top Rank promotes a Crawford title defense. Top Rank, on the other hand, claims the contract only gives Mittendorf a cut of a title defense promoted pursuant to a specific 2011 promotional rights agreement between Top Rank and Crawford—a promotional rights agreement that, Top Rank points out, ended in 2014. But the Court agrees with Mittendorf's reading of the relevant contractual language and will, therefore, deny Top Rank's motion for summary judgment.

BACKGROUND[1]

In 2010, Crawford entered into a promotional rights agreement with TKO Boxing Productions, a Nevada boxing promoter. Filing 90-3 at 2. TKO was granted exclusive rights to promote Crawford's bouts, including ticket sales, broadcast rights, advertising, and merchandise sales. Filing 90-3 at 2-4. In return, as relevant, TKO paid Crawford $7,500 and guaranteed Crawford a certain number of bouts during each year of the agreement, with a minimum purse per bout based on the number of rounds in the bout. Filing 90-3 at 5. If Crawford challenged for a world championship title recognized by one of boxing's four major sanctioning bodies,[2] TKO guaranteed a purse of at least $40,000, and if Crawford was recognized as a world champion by a major sanctioning body, his minimum purse for a title defense would be $100,000. Filing 90-3 at 7.

The initial term of the 2010 promotional rights agreement was 3 years. Filing 90-3 at 4. But if Crawford was designated the highest-ranked mandatory contender in any weight class by a major sanctioning body, the term was extended by 24 months to provide TKO with the opportunity to arrange a title challenge. Filing 90-3 at 7. And if Crawford was recognized as a world champion by a major sanctioning body, TKO had the exclusive right to promote his first 5 title defenses, and the term of the agreement was extended for the time needed to present those bouts, so long as the extension

---

[1] To be clear: because the Court finds the relevant contractual language to be unambiguous, the Court does not—and cannot—rely on extrinsic evidence to determine the contract's meaning. *See Ringle v. Bruton*, 86 P.3d 1032, 1039 (Nev. 2004). To the extent such evidence is referred to here, it is simply to establish narrative context for the parties' disagreement.

[2] The four major sanctioning bodies are the World Boxing Organization ("WBO"), World Boxing Council ("WBC"), World Boxing Association ("WBA"), and International Boxing Federation ("IBF"). Filing 90-3 at 6; *see* filing 108 at 50.

did not exceed 30 months. Filing 90-3 at 7-8. If, on the other hand, Crawford failed to engage in the number of bouts offered by TKO, did not fight an opponent he had approved, or failed to win a bout, then TKO could terminate the agreement. Filing 90-3 at 4-5.

At some point in late 2010, Top Rank—among the top boxing promoters in the country—became interested in signing one of TKO's other fighters. Filing 109-4 at 24. TKO was in some financial distress, and TKO assigned that fighter and several others to Mittendorf, who held a 35 or 40 percent share of TKO. Filing 90-4 at 6; filing 109-4 at 23-25. Mittendorf then went about releasing or reassigning the rights to those fighters, to Top Rank or another promoter. Filing 109-4 at 25, 27.

On June 30, 2011, TKO and Top Rank entered into the contract that is primarily at issue in this case: the "Agreement and Release." Filing 109-2. In the Agreement and Release, TKO agreed to release Crawford from the 2010 TKO promotional rights agreement. Filing 109-2 at 2. Top Rank agreed to pay TKO $7,500 immediately. Filing 109-2 at 2. And, in paragraphs 4 and 5 of the Agreement and Release (which are key to this dispute so they will be set out in full):

> 4. <u>Top Rank Promotional Rights Agreement.</u> TKO hereby consents and agrees that [Top Rank] may enter into a promotional rights agreement ("Promotional Rights Agreement"), bout agreements, and other boxing-related agreements and understandings with [Crawford] and his manager, on terms acceptable to [Top Rank] in its discretion and that TKO shall have no ownership or participation rights in such agreements or the proceeds therefrom.

> 5. <u>Fee</u>. For each Title Defense (for either the WBC, WBO, WBA, or IBF, and as defined in the Promotional Rights Agreement) of [Crawford]'s promoted by Top Rank pursuant to the Promotional Rights Agreement, TKO shall be paid a fee equal to eight percent (8%) of the purse payable to [Crawford] for such Title Defense, which amount shall be paid to TKO within five (5) business days of each bout.

Filing 109-2 at 2-3. Top Rank made the required $7,500 payment, and TKO assigned its rights under the Agreement and Release to Mittendorf. Filing 90-5; filing 90-10 at 2.

On the same day the Agreement and Release was executed, Crawford and Top Rank entered into a new promotional rights agreement, which was structured similarly to Crawford's previous promotional rights agreement with TKO, and began with a 5-year term dated from Crawford's first bout pursuant to the new promotional rights agreement. Filing 104. But as with the previous agreement, Crawford's new promotional rights agreement with Top Rank provided that Top Rank could terminate the agreement if Crawford didn't fight in the prescribed number of offered bouts, didn't fight an opponent he had approved, or failed to win a bout. Filing 104 at 4-5.

Crawford went on to win several bouts from 2011 to 2013, and on March 1, 2014 defeated Ricky Burns to win the WBO World Lightweight Title. Filing 90-8 at 3. He successfully defended that title against Yuriorkis Gamboa in June 2014, and Top Rank paid Mittendorf pursuant to the Agreement and Release. Filing 90-8 at 3; filing 90-10 at 2.

After the Gamboa bout, Crawford and Top Rank renegotiated their agreement, and their new "Exclusive Restated Promotional Rights Agreement" "supersede[d] and replace[d]" the 2011 promotional rights

agreement between Crawford and Top Rank. Filing 90-9 at 2. The Exclusive Restated Promotional Rights Agreement was similar in structure to the previous promotional rights agreements, beginning a new 3-year term with Crawford's next bout, but guaranteeing Crawford substantially larger purses per bout, including additional compensation based on the gate revenues for bouts occurring in Omaha. Filing 90-9 at 4-7. Top Rank could still terminate the agreement if Crawford didn't fight as required or failed to win a bout. Filing 90-9 at 4-5.

Crawford defended his WBO World Lightweight Title against Ray Beltrán in November 2014, and Top Rank again paid Mittendorf pursuant to the Agreement and Release. Filing 90-8 at 3; filing 90-10 at 2. Crawford then moved up a weight class and defeated Thomas Dulorme for the vacant WBO World Super Lightweight (or junior welterweight) Title. Filing 90-8 at 2. Crawford and Dulorme were fighting for a vacant title, so it wasn't a "title defense" and Top Rank didn't pay Mittendorf pursuant to the Agreement and Release. Filing 108 at 44. But Top Rank did pay Mittendorf after Crawford successfully defended his new title against Dierry Jean in October 2015 and Hank Lundy in February 2016. Filing 90-8 at 2; filing 90-10 at 2-3.

In July 2016, Crawford put his WBO title on the line in a "unification bout" against Viktor Postol, who held the WBC World Super Lightweight Title. Filing 90-8 at 2. Top Rank did not pay Mittendorf after that bout. Filing 89 at 5. (The parties dispute whether a "unification bout" is also a "title defense" within the meaning of the Agreement and Release, but that dispute is not implicated by the present motion for summary judgment.) Crawford won both titles, and defended them against John Molina Jr. in December 2016 and Félix Díaz in May 2017. Filing 90-8 at 2. But Top Rank did not pay Mittendorf after the Molina or Díaz bouts. Filing 89 at 5. Finally,

Crawford defeated Julius Indongo in another unification bout in August 2017, capturing the IBF, WBA, WBC, and WBO titles. Filing 90-8 at 2. Top Rank did not pay Mittendorf after the Indongo bout either. Filing 89 at 5.

Mittendorf sued Top Rank asserting various claims for relief generally sounding in breach of contract. Filing 52. Top Rank moves for summary judgment on one issue: the term of the Agreement and Release. Filing 86.

## STANDARD OF REVIEW

Summary judgment is proper if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). The movant bears the initial responsibility of informing the Court of the basis for the motion, and must identify those portions of the record which the movant believes demonstrate the absence of a genuine issue of material fact. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for trial. *Id.*

On a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts. *Id.* Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the evidence are jury functions, not those of a judge. *Id.* But the nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts. *Id.* In order to show that disputed facts are material, the party opposing summary judgment must cite to the relevant substantive law in identifying facts that might affect the outcome of the suit. *Quinn v. St. Louis County*, 653 F.3d 745, 751 (8th Cir. 2011). The mere existence of a scintilla of evidence in support of the nonmovant's position will be insufficient; there must be evidence on which

the jury could conceivably find for the nonmovant. *Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 791-92 (8th Cir. 2011). Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Torgerson*, 643 F.3d at 1042.

Rule 56 also allows the Court to grant summary judgment as to some issues but not as to others. *See* Fed. R. Civ. P. 56(a). Upon doing so, the Court may "enter an order stating any material fact—including an item of damages or other relief—that is not genuinely in dispute," and thereby treat such a fact "as established in the case." Fed. R. Civ. P. 56(g).

DISCUSSION

At issue is the term—or lack thereof—of the Agreement and Release. Mittendorf argues that the Agreement and Release contains no term—that is, it does not expire at a fixed time. Instead, Mittendorf says, Top Rank must pay for any Crawford title defense. Top Rank, on the other hand, insists that the Agreement and Release was specific to one, and only one, promotional rights agreement between Top Rank and Crawford—the promotional rights agreement they signed on June 30, 2011, contemporaneous with the Agreement and Release. And what's more, Top Rank argues, that promotional rights agreement was terminated and superseded in 2014, so Top Rank's obligations under the Agreement and Release ended as well.

But Top Rank's interpretation of the Agreement and Release is not supported by basic principles of contract interpretation. The objective of interpreting contracts is to discern the intent of the contracting parties, and traditional rules of contract interpretation are employed to accomplish that result. *Am. First Fed. Credit Union v. Soro*, 359 P.3d 105, 106 (Nev. 2015).[3]

---

[3] The parties agree that Nevada law applies here. *See* filing 109-2 at 3.

Contract interpretation is a question of law, and if the language of the contract is clear and unambiguous, it will be enforced as written. *Id.* And the Court has no authority to alter the terms of an unambiguous contract. *[Canfora v. Coast Hotels & Casinos, Inc.](#)*, 121 P.3d 599, 603 (Nev. 2005).

"We do not rewrite parties' contracts, in part, because the parties' failure to agree to a judicially blue-penciled term's inclusion risks trampling the parties' intent." *[Harrison v. Harrison](#)*, 376 P.3d 173, 177 (Nev. 2016) (citations omitted). The Court is not at liberty to insert words that the parties did not use. *See [Edelstein v. Bank of New York Mellon](#)*, 286 P.3d 249, 258 (Nev. 2012). "Neither a court of law nor a court of equity can interpolate in a contract what the contract does not contain." *[State Dep't of Transportation v. Eighth Judicial Dist. Court in & for Cty. of Clark](#)*, 402 P.3d 677, 682 (Nev. 2017) (cleaned up).

And Top Rank's interpretation of the Agreement and Release depends on reading language into it that clearly cannot be found there. The Agreement and Release provides that Top Rank and Crawford could "enter into a promotional rights agreement" and that title defense bouts promoted pursuant to the Top Rank-Crawford promotional rights agreement required Top Rank to pay a fee to TKO (*i.e.* Mittendorf). To limit that language to a *particular* promotional rights agreement—*i.e.* the Promotional Rights Agreement of June 20, 2011—without any language specifically identifying that agreement would be to insert a limitation into the Agreement and Release that simply cannot be found within the four corners of the document. *See [Soro](#),* 359 P.3d at 108.

The Court is aware that multiple writings signed at the same time, addressing the same subject, and cross-referencing one another may be taken to comprise a single agreement. *[Coast to Coast Demolition & Crushing, Inc. v.](#)*

*Real Equity Pursuit, LLC*, 226 P.3d 605, 608 (Nev. 2010). That principle is not applicable in this case, where no "single agreement" can be forged without a mutuality of parties among the different contracts—but even if one could be, the plain language of the Agreement and Release does not specifically cross-reference the June 30, 2011 promotional rights agreement. The Court is also aware that two separate writings may be sufficiently connected by internal evidence without any express words of reference of one to the other—that they refer to the same transaction and state the terms thereof may appear from the character of the subject matter and from the nature of the terms. *Haspray v. Pasarelli*, 380 P.2d 919, 921 (Nev. 1963). But the Court finds no persuasive internal evidence here.

Top Rank, of course, argues to the contrary, going so far as to contend that "[w]ith regard to duration, the Agreement and Release specifically incorporated and employed terms defined in the Promotional Rights Agreement, which had a five-year term . . . ." Filing 89 at 9. Top Rank is clearly implying that the terms "specifically incorporated and employed" in the Agreement and Release were terms "regard[ing] duration." But that does not survive even a cursory reading of the Agreement and Release, which does no such thing. The only term cross-referenced from the promotional rights agreement is "Title Defense," which is capitalized, as Top Rank points out. Filing 112 at 6. But a "title defense" is a boxing term that is, the Court infers, found in most if not all promotional rights agreements. *E.g. Don King Promotions v. Douglas*, 742 F. Supp. 741, 762 n.21 (S.D.N.Y. 1990). And even if "Title Defense" could be read as referring specifically to a particular definition found in another document, where a reference to another writing is made for a particular and specified purpose, such other writing becomes a part only for that specified purpose. *Lincoln Welding Works, Inc. v. Ramirez*,

647 P.2d 381, 383 (Nev. 1982). There is nothing to suggest here that the Agreement and Release was also meant to incorporate, *sub silentio*, the 5-year term of the June 30, 2011 Promotional Rights Agreement.

Top Rank also points to the fact that the Agreement and Release permitted Top Rank and Crawford to enter into "a" promotional rights agreement—wording that, Top Rank suggests, indicates a single promotional rights agreement, which must be the June 30, 2011 agreement. Filing 112 at 6-7. But that is a lot of weight for one word to carry, absent any other language actually specifying the June 30, 2011 promotional rights agreement, and is just as easily explained by the assumption that a boxer and promoter only have one promotional rights agreement at a time.

In sum, Mittendorf's reading of the Agreement and Release is supported by its unambiguous language. But that, according to Top Rank, creates another problem—that would, Top Rank says, create a perpetual obligation on Top Rank's part. Filing 89 at 11. And Nevada, like most states, holds that as a matter of public policy, courts should avoid construing contracts to impose a perpetual obligation. *Bell v. Leven*, 90 P.3d 1286, 1288 (Nev. 2004). So, Top Rank argues, the Court should reject Mittendorf's reading of the Agreement and Release in order to avoid imposing a perpetual obligation on Top Rank. Filing 89 at 11.

When the language of a contract clearly provides that the contract is to have a perpetual duration, however, the courts must enforce the contract according to its terms. *Id.* And more importantly, the Agreement and Release does not have the sort of "perpetual duration" that cases like *Bell* seek to avoid. In *Bell*, the Nevada Supreme Court simply recognized general principles of contract law found in any number of jurisdictions. *See id.* at 390-91. And under those principles,

> [a] perpetual contract runs without end or without provision for its termination. An indefinite contract runs without a fixed end but contains provisions under which the contract might terminate at any time. . . . Thus where termination has been provided for in the contract, even if continuous performance is a possibility, courts should not refuse to enforce such contracts or read into them different conditions of termination.

*Nicholas Labs. Ltd. v. Almay, Inc.*, 723 F. Supp. 1015, 1018 (S.D.N.Y. 1989), *aff'd,* 900 F.2d 19 (2d Cir. 1990); *accord GAPIII, Inc. v. Seal Indus., Inc.*, 789 S.E.2d 321, 331 (Ga. Ct. App. 2016).

A seminal case on the issue is *Warner-Lambert Pharm. Co. v. John J. Reynolds, Inc.*, which concerned product licensing fees that were payable so long as the licensee chose to continue manufacturing the licensed product. 178 F. Supp. 655 (S.D.N.Y. 1959), *aff'd,* 280 F.2d 197 (2d Cir. 1960). The licensee attempted to avoid the licensing agreement as imposing a perpetual obligation, but the district court rejected that argument, explaining that

> [t]he word 'perpetuity' is often applied very loosely to contractual obligations. Indiscriminate application of the term serves only to confuse. The mere fact that an obligation under a contract may continue for a very long time is no reason in itself for declaring the contract to exist in perpetuity or for giving it a construction which would do violence to the expressed intent of the parties.

*Id.* at 661. While some contracts "omit any point of time or any condition which would terminate the promisor's liability[,]" "contracts which provide no fixed date for the termination of the promisor's obligation but condition the

obligation upon an event which would necessarily terminate the contract are in quite a different category[.]" *Id.* at 661; *accord Don King Productions, Inc.*, 742 F. Supp. at 763. And, the district court found, the agreements at issue in that case clearly terminated the licensee's obligation to pay the fee when the licensee chose to stop making the product. *Warner-Lambert Pharm. Co.*, 178 F. Supp. at 661-63. "The obligation," the court wrote, "is conditioned upon an event arising out of the very arrangement between the parties which is the subject matter of the contract." *Id.* at 662. The obligation was not perpetual, the court concluded, because whether or not the obligation continued was in the licensee's control. *Id.* at 663.

"The important factor, then, is not whether the contract fails to specify a termination date, but whether there is an ascertainable event which necessarily implies termination." *Lura v. Multaplex, Inc.*, 179 Cal. Rptr. 847, 850 (Ct. App. 1982); *see, e.g.*, *Fein v. Chirhoclin, Inc.*, No. CV PX 15-3709, 2017 WL 467743, at *7 (D. Md. Feb. 3, 2017); *Lamoureux v. MPSC, Inc.*, No. CV 14-1488, 2015 WL 8082598, at *6 (D. Minn. Dec. 7, 2015), *aff'd,* 849 F.3d 737 (8th Cir. 2017). The Nebraska Supreme Court's decision in *Muller Enters. v. Gerber* is instructive. 133 N.W.2d 913 (Neb. 1965). In that case, the plaintiff agreed to introduce an advertising agent to an insurance company, in exchange for a 10 percent commission on the amounts paid to the advertising agent by the insurance company pursuant to their subsequent deal. *Id.* at 916-17. But eventually, the advertising agent stopped paying, and the plaintiff sued. *Id.* at 917. Applying Massachusetts law, the Nebraska Supreme Court rejected the advertising agent's attempt to avoid the contract, explaining that the advertising agent's "own wishes determine[d]" the termination date of the contract. *Id.* at 919.

> His only obligation is to pay [the plaintiff] 10 percent for as long as he himself performs the contract. If it becomes unprofitable or onerous, all he has to do is quit. He reserved exclusive control of the time element himself when he drew the contract and he cannot be heard to complain of the fact that he himself did not terminate it. To hold otherwise would be to permit the receipt of continuous benefits under a contract without payment of the corresponding obligation. We point out that the contract by its terms together with the conduct of [the advertising agent] in paying, conclusively show full performance by [the plaintiff]. The contract is executory on [the advertising agent]'s part and it seems to us that it clearly contemplates that the duration of the obligation is commensurate with [the advertising agent]'s performance, which he may terminate at any time.

*Id.* "Contracts to continue," the court explained, "not until a fixed date but until the happening of an event which is certain to occur sooner or later, have been enforced." *Id.* Where the contract has been fully performed on one side, "the law will not permit the injustice of the other party retaining the benefit without paying unless compelled by some inexorable rule." *Id.*; *see Portland Section of Council of Jewish Women v. Sisters of Charity of Providence in Oregon*, 513 P.2d 1183, 1187 (Or. 1973) (if consideration for a promise is fully executed, courts are reluctant to hold the promise terminable).

Similarly, in *Don King Productions, Inc.*, the district court rejected James "Buster" Douglas's attempt to avoid his promotional rights agreement with Don King after Douglas defeated Mike Tyson for the world heavyweight championship. 742 F. Supp. 741. Douglas argued that the promotional rights agreement was indefinite because, pursuant to an automatic extension that

kicked in when Douglas became world champion, it could run for an unlimited time. *Id.* at 763. But the agreement, the court pointed out, did not contemplate an indefinite term: it extended only "to cover the entire period Douglas is world champion and a period of two years following the date on which Douglas thereafter ceases, for any reason, to be so recognized as world champion." *Id.* (cleaned up). "So extensive a commitment of one's services might be questioned as excessive," the court wrote, but it was not indefinite. *Id.* And implicit in that conclusion is the obvious fact that Douglas would not, and could not, indefinitely remain world heavyweight champion.

The same principles apply here. The Agreement and Release does not establish a certain time or date on which it ceases to be effective, nor does it set forth a limit on the number of occasions Top Rank might be asked to perform—but the Agreement and Release does not demand *perpetual* performance. Its obligations will necessarily terminate when, at some inevitable point, Crawford no longer competes in title defense bouts. Its obligations will also terminate if, at some point, Top Rank stops promoting Crawford's bouts—a condition which is substantially under Top Rank's control. *See [Warner-Lambert Pharm. Co.](), 178 F. Supp. at 663*; *see also [Fein, 2017 WL 467743]()*, at \*6. The Court has little question that if confronted with the question, Nevada courts would likewise conclude that such an agreement does not create a perpetual obligation.

And Top Rank's alternative interpretation of the Agreement and Release would only avoid a purportedly "perpetual" obligation by permitting Top Rank to avoid any obligation whatsoever, even performance that was clearly bargained for. A basic rule of contract interpretation is that every word must be given effect if at all possible, and court should not interpret a contract so as to make meaningless its provisions. *[Solid]()*, 393 P.3d at 672. But

- 14 -

Top Rank's interpretation would have permitted Top Rank to obviate its duties under the Agreement and Release by entering into a renegotiated promotional rights agreement with Crawford at literally any time.

Top Rank waited until 2014 to do so, and claims that the Exclusive Restated Promotional Rights Agreement terminated the Agreement and Release—but Top Rank offers no principled basis to distinguish the 2014 Exclusive Restated Promotional Rights Agreement from a hypothetical "July 1, 2011 Exclusive Restated Promotional Rights Agreement" that would have relieved Top Rank of any obligation to pay Mittendorf for *any* of Crawford's title defenses. That would, in fact, be the logical consequence of tying the Agreement and Release exclusively to the June 30, 2011 Promotional Rights Agreement. While that didn't happen, it could have under Top Rank's interpretation of the Agreement and Release—strongly suggesting that Top Rank's interpretation is not reasonable.

In short, the Court finds that the unambiguous language of the Agreement and Release obliges Top Rank to pay Mittendorf eight percent of Crawford's purse for any Crawford title defense that Top Rank promotes pursuant to a promotional rights agreement. Having reached that conclusion, the Court does not consider the parties' remaining arguments with respect to other principles of contractual interpretation. *See State ex rel. Masto v. Second Judicial Dist. Court ex rel. Cty. of Washoe,* 199 P.3d 828, 832 (Nev. 2009) (a contract is ambiguous only when it is subject to more than one reasonable interpretation); *see also Ringle,* 86 P.3d at 1030; *Shelton v. Shelton,* 78 P.3d 507, 510 (Nev. 2003). Top Rank's motion for summary judgment will be denied.

IT IS ORDERED:

1. Top Rank's motion for summary judgment (filing 86) is denied.

2. Top Rank's motion for oral argument (filing 111) is denied.

3. This matter is referred to the Magistrate Judge for case progression.

Dated this 9th day of April, 2018.

BY THE COURT:

John M. Gerrard
United States District Judge