IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| MIDDENDORF SPORTS, a Maryland Sole Proprietorship,<br><br>Plaintiff,<br><br>vs.<br><br>TOP RANK, INC., a Nevada corporation, and TERENCE CRAWFORD, an individual,<br><br>Defendants. | 8:17-CV-11<br><br>FINDINGS OF FACT AND CONCLUSIONS OF LAW |

This matter is before the Court on a bench trial on two discrete contractual issues. The issue primarily contested between the parties—the term of the relevant contract—has already been decided by the Court on the parties' motions for summary judgment. Filing 123; filing 140. Remaining to be decided is how to interpret the provisions of the agreement that establish when the plaintiff should be paid, and how much.

As explained below, the Court agrees with the plaintiff regarding the relevant contractual language. Accordingly, the Court finds for the plaintiff, and will enter judgment against defendant Top Rank, Inc., in the amount of $520,296.87.

STATEMENT OF FACTS

Most of the relevant facts are undisputed, and many have been recited by the Court before, but the Court will restate those relevant to the issues presented here. The defendants in this case are successful boxer Terence "Bud" Crawford and his promoter, Top Rank, Incorporated. The plaintiff is

Middendorf Sports, a sole proprietorship of Chris Middendorf (collectively, Middendorf).

In 2010, Crawford entered into a promotional rights agreement with TKO Boxing Productions, a Nevada boxing promoter. Filing 153-1 at 2. At some point in late 2010, Top Rank—among the top boxing promoters in the country—became interested in signing one of TKO's other fighters. Filing 143-1 at 23. TKO was in some financial distress, and TKO assigned that fighter and several others to Middendorf, who held a 35 or 40 percent share of TKO. Filing 145-11 at 5; filing 143-1 at 22-24. Middendorf then released or reassigned the rights to those fighters to Top Rank or another promoter. Filing 143-1 at 24, 26.

On June 30, 2011, TKO and Top Rank entered into the contract that is primarily at issue in this case: the "Agreement and Release." Filing 145-1. In the Agreement and Release, TKO agreed to release Crawford from the 2010 TKO promotional rights agreement. Filing 145-1 at 1. The Agreement and Release specifically provided that

> For each Title Defense (for either the WBC, WBO, WBA, or IBF, and as defined in the Promotional Rights Agreement) of [Crawford]'s promoted by Top Rank pursuant to the Promotional Rights Agreement, TKO shall be paid a fee equal to eight percent (8%) of the purse payable to [Crawford] for such Title Defense, which amount shall be paid to TKO within five (5) business days of each bout.

Filing 145-1 at 1-2. TKO assigned its rights under the Agreement and Release to Middendorf. Filing 145-4.

On the same day the Agreement and Release was executed, Crawford and Top Rank entered into a new promotional rights agreement. Filing 145-3. Crawford went on to win several bouts from 2011 to 2013, and on March 1, 2014 defeated Ricky Burns to win the WBO World Lightweight Title. Filing 145-17 at 2. He successfully defended that title against Yuriorkis Gamboa in June 2014. Filing 145-17 at 2. For that bout, Top Rank paid Crawford a purse of $500,000 and gate participation in the amount of $21,931.60.[1] Filing 141 at 3. Pursuant to the Agreement and Release, Top Rank paid Middendorf $40,000. Filing 141 at 3.

After the Gamboa bout, Crawford and Top Rank entered into a new "Exclusive Restated Promotional Rights Agreement." Filing 145-5. The Exclusive Restated Promotional Rights Agreement guaranteed Crawford substantially larger purses per bout, including additional compensation based on the gate participation for bouts occurring in Omaha. Filing 145-5 at 4-5.

Crawford defended his WBO World Lightweight Title against Ray Beltrán in November 2014—Top Rank paid Crawford a purse of $800,000, and Middendorf $40,000. Filing 145-17 at 2; Filing 141 at 3. Crawford then moved up a weight class and defeated Thomas Dulorme for the vacant WBO World Super Lightweight (or junior welterweight) Title. Filing 145-17 at 2. That wasn't a "title defense," so Top Rank didn't pay Middendorf pursuant to the Agreement and Release. Filing 143-2 at 43. But after Crawford successfully defended his new title against Dierry Jean in October 2015, Top Rank paid Crawford a purse of $1,200,000 and gate participation of $26,824.31, and paid

---

[1] As will be discussed below, the actual amount of the "purse" is a matter of some dispute between the parties. The Court distinguishes between the "purse" and "gate participation" here because that's what the parties called them, *see* filing 141 at 3-4, and for lack of another word for "purse."

Middendorf $96,000. Filing 145-17 at 2; filing 141 at 3. After Crawford defended his title against Hank Lundy in February 2016, Top Rank paid Crawford a purse of $1,210,000 and Middendorf $96,800. Filing 145-17 at 2; filing 141 at 3.

In July 2016, Crawford put his WBO title on the line in a "unification bout" against Viktor Postol, who held the WBC World Super Lightweight Title. Filing 145-17 at 2. Top Rank paid Crawford a purse of $1,300,000, but did not pay Middendorf after that bout. Crawford won both titles, and defended them against John Molina Jr. in December 2016 and Félix Díaz in May 2017. Filing 145-17 at 2. Top Rank paid Crawford a purse of $1,475,000 and gate participation of $29,955 for the Molina bout, and a purse of $1,650,000 for the Díaz bout. Filing 141 at 4. But Top Rank did not pay Middendorf after the Molina or Díaz bouts. Filing 141 at 4. Finally, Crawford defeated Julius Indongo in another unification bout in August 2017, capturing the IBF, WBA, WBC, and WBO titles. Filing 145-17 at 2. Top Rank paid Crawford a purse of $2,000,000, but did not pay Middendorf after the Indongo bout either. Filing 141 at 4 and n.2. This litigation ensued. *See* filing 52.

CONCLUSIONS OF LAW

The Court's most significant conclusion of law was reached in an earlier decision, but to establish context, the Court will restate it here: the Court found that under the unambiguous language of the Agreement and Release, Top Rank is obliged to pay Middendorf eight percent of Crawford's "purse" for any Crawford "title defense" that Top Rank promotes pursuant to a promotional rights agreement. Filing 123 at 15. In other words, the Court found that the Agreement and Release did not effectively terminate with the 2011 Crawford-Top Rank promotional rights agreement—instead, it carried over to the 2014 Exclusive Restated Promotional Rights Agreement. *See* filing 123. But as the

quotation marks above imply, there are still two terms the parties disagree about: "purse" and "title defense." Filing 141 at 5. Those matters are before the Court now.

In deciding those issues, the Court is guided by familiar principles of contract interpretation. The objective of interpreting contracts is to discern the intent of the contracting parties, and traditional rules of contract interpretation are employed to accomplish that result. *Am. First Fed. Credit Union v. Soro*, 359 P.3d 105, 106 (Nev. 2015). Contract interpretation is a question of law, and if the language of the contract is clear and unambiguous, it will be enforced as written. *Id.* And the Court has no authority to alter the terms of an unambiguous contract. *Canfora v. Coast Hotels & Casinos, Inc.*, 121 P.3d 599, 603 (Nev. 2005).

"We do not rewrite parties' contracts, in part, because the parties' failure to agree to a judicially blue-penciled term's inclusion risks trampling the parties' intent." *Harrison v. Harrison*, 376 P.3d 173, 177 (Nev. 2016) (citations omitted). The Court is not at liberty to insert words that the parties did not use. *See Edelstein v. Bank of New York Mellon*, 286 P.3d 249, 258 (Nev. 2012). "Neither a court of law nor a court of equity can interpolate in a contract what the contract does not contain." *State Dep't of Transportation v. Eighth Judicial Dist. Court in & for Cty. of Clark*, 402 P.3d 677, 682 (Nev. 2017) (cleaned up). But every word must be given effect if possible, and a court should not interpret a contract so as to make meaningless its provisions. *Solid v. Eighth Judicial Dist. Court of State in & for Cty. of Clark*, 393 P.3d 666, 672 (Nev. 2017).

### Gate Participation is included in the "Purse"

The specific disagreement between the parties regarding the purse is whether gate participation is part of the "purse" such that Middendorf was

entitled to receive eight percent of Crawford's gate participation pursuant to the Agreement and Release. Filing 141 at 5. Top Rank insists it's not.

Top Rank contends that there is "no evidence in the record to suggest that gate participation is considered to be part of a fighter's purse in the boxing industry." Filing 157 at 10. And Top Rank points to Crawford's testimony that when he pays his manager and trainer after a fight for their percentage of the purse, gate participation money isn't included. *See* filing 150 at 5, 7.

But that's a fairly thin reed upon which to base a broader conclusion about what's included in the "purse" as that term was used in the Agreement and Release. While Top Rank suggests that a "purse" is a boxing term of art, there's little in the record to distinguish the use of the word "purse" here from its long-established relevant meaning: "[a] sum of money, usually one to which contestants or their owners do not contribute, offered as a prize. . . ." Webster's New Int'l Dictionary of the English Language (1919); *see* Black's Law Dictionary (10th ed. 2014) ("[a] sum of money available to the winner of a contest or event; a prize"); New Oxford Am. Dictionary (3d ed. 2010) ("a sum of money given as a prize in a sporting contest, especially a boxing match"); Webster's Third New Int'l Dictionary Unabridged (1981) ("a sum of money offered as a prize or as a present"); *see also Pompano Horse Club v. State,* 111 So. 801, 813 (Fla. 1927); *Toomey v. Penwell,* 245 P. 943, 945 (Mont. 1926).

Stated another way, while Top Rank is clear about one thing it contends isn't part of a "purse," it offers little to explain what a "purse" is, more generally—leaving the Court with the general understanding of the term. And it seems evident that's the sense in which the term was used in the Agreement and Release: Middendorf was to get eight percent of whatever Crawford did for a title defense. The Court's not persuaded that Middendorf's piece of the action

depends on how a promotional rights agreement, or a particular bout agreement, label that compensation.²

After all, under Top Rank's construction of the Agreement and Release, there would be nothing to preclude Top Rank from agreeing to pay a $1 "purse" and a $1,000,000 "fight bonus"—and only owing Middendorf 8¢. Nor would there be anything to preclude Top Rank from eschewing a "purse" entirely, in favor of providing the fighter with a far larger percentage of the gate receipts or another source of funding, such as pay-per-view revenue. The Court can't imagine that's what the contracting parties intended when the Agreement and Release was reached.

There is a potential distinction between the gate participation money for the Gamboa bout and the subsequent Jean and Molina bouts. When Crawford fought Jean and Molina, he and Top Rank had entered into the Exclusive Restated Promotional Rights Agreement, which specifically provided for gate participation money.³ Filing 148 at 5-6. When Crawford fought Gamboa, though, it was under the 2011 promotional rights agreement—which didn't require Crawford to get a piece of the gate. *See* filing 147. Crawford was paid gate participation for the Gamboa bout because it was negotiated as part of the bout agreement. Filing 151 at 28.

---

² The bout agreements—that is, the specific agreements between promoter and fighter for each fight—might have been illuminating on this point, as might the boxing commission forms for the fights. *See* filing 149 at 38; filing 151 at 28. But the Court doesn't have them.

³ The parties disagree about the significance of the gate participation language of the Exclusive Restated Promotional Rights Agreement appearing as a subsection under the heading "Minimum Bouts and Purses." Filing 145-5 at 4; *compare* filing 153 at 7, *with* filing 157 at 11. The Court's inclined to agree with Top Rank that the heading in the Exclusive Restated Promotional Rights Agreement is not particularly meaningful.

Top Rank suggests that gate participation isn't part of the "purse" for the Gamboa bout in particular because the 2011 promotional rights agreement "made no mention of gate participation and certainly did not provide that gate participation was a component of Crawford's purse." Filing 157 at 10. But although the promotional rights agreement sets a floor for the purse, depending on the kind of fight, the actual purse is set by the bout agreement, not the promotional rights agreement. *See* filing 149 at 38; *see also* filing 147 at 5-8. And as explained above, it's really the Agreement and Release—which is, after all, the contract that's been breached—that's more central to the issue.

In sum, the Court finds that the "purse," within the meaning of the Agreement and Release, is simply the remuneration paid to Crawford, regardless of what it's based upon or how it's calculated—or labeled. That means that the "purse" includes money based on gate participation when it's part of Crawford's payment for the fight.

## A UNIFICATION BOUT IS A "TITLE DEFENSE"

The other remaining disagreement between the parties is whether Crawford's bouts with Postol and Indongo—title unification bouts—were also "Title Defenses" such that Middendorf was entitled to eight percent of Crawford's purse for those bouts. Filing 141 at 5. Top Rank contends that a "title unification" is categorically different from a "title defense," excluding it from the latter term. *See* filing 157 at 7.

The Court has already tipped its hand somewhat on this point, observing in the context of ruling on Top Rank's motion in limine that "[t]here is a strong argument to be made that a unification bout is simply a combination of a title defense and a title challenge, and accordingly is included in a 'title defense' within the meaning of the Agreement and Release." Filing 124 at 5. The Court observed then that Top Rank seemed to be seeking to avoid that argument "by

invoking a technical understanding of the term 'title defense[.]'" Filing 124 at 5. And sure enough, Top Rank now rests its case on the contention that " the terms 'Title Challenge,' 'Title Defense,' and 'Title Unification' are terms of art with technical meanings in the boxing industry." Filing 157 at 7.

Perhaps so (although it's far from clear how the "technical meanings" of those terms might differ from their plain English meanings). But that's somewhat beside the point, because this issue doesn't turn on which category a particular fight might fall into—it turns on whether a fight can fall into more than one category at the same time. *See* filing 141 at 3 n.1. And Top Rank points the Court to nothing suggesting it can't.

The parties have, in fact, agreed on what each of those "terms of art with technical meanings" actually means. A "Title Challenge" is "any bout in which Crawford challenged for a world championship title as recognized by one or more of the WBC, WBA, WBO or IBF sanctioning bodies." Filing 141 at 2. A "Title Defense" is "any bout in which Crawford defended his world championship title as recognized by one or more of the WBC, WBA, WBO or IBF sanctioning bodies." Filing 141 at 2. A "Title Unification Bout" is "any bout in which Crawford challenged for a world championship title as recognized by one or more of the WBC, WBA, WBO or IBF sanctioning bodies while simultaneously defending his world championship title as recognized by one or more of the WBC, WBA, WBO or IBF sanctioning bodies." Filing 141 at 3. And the evidence adduced by the parties is wholly consistent with those definitions. *See* filing 149 at 50-51; filing 150 at 9; filing 143-1 at 43, 46, 49.[4]

---

[4] In fact, the most evocative definition of a "unification bout" probably came from Crawford's testimony: "A unification bout is when two champions put on their belts to fight each other." Filing 150 at 9. It's hard to be clearer than that.

Top Rank accuses Middendorf of asking the Court "to interpret the term 'Title Defense' pursuant to its plain, ordinary meaning even though it is a term of art with a technical meaning in the boxing industry." That's a straw man.[5] For Top Rank's argument to carry water, it must demonstrate that these are terms of art <u>and</u> that they're mutually exclusive. But by definition, they're not. Nor does their usage indicate that they are, in any of the contexts present in the record.

To begin with, as Middendorf points out, Top Rank paid sanctioning fees for both Crawford's pure "title defenses" and his "unification bouts." *See* filing 141 at 3-4. But sanctioning fees are paid to a title organization "[w]hen a fighter challenges or defends for a title in a bout[.]" Filing 152 at 7; *see also* filing 143-2 at 44. If, as Top Rank suggests, a "unification bout" is categorically separate, then it would be neither. Instead, sanctioning fees were paid to <u>all</u> the sanctioning bodies involved in each of Crawford's unification bouts, *see* filing 141 at 4—suggesting that at least according to boxing's sanctioning bodies, those bouts were both "title defenses" and "title challenges."

The 2011 promotional rights agreement also presents a useful example. Filing 147. That agreement guaranteed Crawford a minimum purse of a few thousand dollars per bout, based on the length of the fight. Filing 147 at 5. But for a "championship challenge bout," Crawford was guaranteed a purse of at least $40,000. Filing 147 at 7. And for a "championship title defense bout," Crawford was guaranteed a purse of at least $100,000. Filing 147 at 8. But the agreement didn't provide any kind of guarantee for a "unification bout." *See* filing 147. That seems peculiar—if, as Top Rank contends, a "unification bout" is an exclusive category. After all, as Top Rank president Todd duBoef said, a unification bout is "one of the more pristine expensive endeavors" for "putting

---

[5] In fact, Middendorf testified to the complete contrary. Filing 143-1 at 39.

on a big fight." Filing 149 at 51. It's hard to believe that the promotional rights agreement would guarantee increasingly lucrative purses for increasingly prestigious bouts… and then guarantee nothing for the most prestigious bout of all. The agreement only makes sense if it's understood, in the business of boxing, that a unification bout also involves a title defense.

And, in fact, duBoef's explanation of the terms draws a useful distinction. He testified that those categories—"title defense," "title challenge" and "unification"—are "categories" in "the boxing art." Filing 143-2 at 50. But, he said, "in our contract it has title challenge. In our contract it has title defenses. And in websites and in newsprint and in marketing they use title challenge, title defense, unification. It's commonly used as those three. . . ." Filing 143-2 at 50. And <u>that</u> usage is consistent with the record—but this is a case about a contract, not about marketing. Top Rank's argument that the categories of "title defense" and "unification bout" are mutually exclusive is simply not supported by the evidence.

Accordingly, the Court finds that Crawford's bouts against Postol and Indongo were "title defenses" within the meaning of the Agreement and Release, entitling Middendorf to a sum equal to eight percent of Crawford's purses for those bouts.

CONCLUSION

As set forth above, the Court generally finds for Middendorf on the contested issues remaining for the Court's disposition, and, the Court enters these Findings of Fact and Conclusions of Law accordingly. *See* Fed. R. Civ. P. 52(a). The conclusions reached *supra*, along with the Court's previous orders, should effectively provide any necessary declaratory relief. It does not appear to the Court that the parties have any need for a further accounting. So, based on its previous rulings and some straightforward math, the Court will enter

judgment for Middendorf, and against Top Rank,[6] in the amount of $520,296.87 (plus appropriate prejudgment interest).[7]

| Bout | Purse | Gate | Eight Percent |
|---|---|---|---|
| Gamboa | $500,000 | $21,931.60 | $41,754.53 |
| Jean | $1,200,000 | $26,824.31 | $98,145.94 |
| Postol | $1,300,000 | $0 | $104,000.00 |
| Molina | $1,475,000 | $29,955 | $120,396.40 |
| Díaz | $1,650,000 | $0 | $132,000.00 |
| Indongo | $2,000,000 | $0 | $160,000.00 |
| Total | $8,125,000.00 | $78,710.91 | $656,296.87 |
| Already paid | | | -$136,000 |
| Amount due | | | $520,296.87 |

IT IS ORDERED:

1. The Court's Findings of Fact and Conclusions of Law are entered as set forth above.

---

[6] Although Crawford is also named as a defendant, so far as the Court can tell, there is no basis for holding him liable to Middendorf.

[7] Because this is a diversity jurisdiction case, prejudgment interest is determined under state law—specifically, Nev. Rev. Stat. § 99.040. *Emmenegger v. Bull Moose Tube Co.*, 324 F.3d 616, 624 (8th Cir. 2003); *see State Drywall, Inc. v. Rhodes Design & Dev.*, 127 P.3d 1082, 1086 (Nev. 2006).

2. Judgment is entered for Middendorf, and against Top Rank, in the amount of $520,296.87, plus prejudgment interest calculated pursuant to Nev. Rev. Stat. § 99.040.

3. Middendorf's claims against Crawford are dismissed.

4. A separate judgment will be entered.

Dated this 31st day of March, 2019.

BY THE COURT:

John M. Gerrard
Chief United States District Judge